**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES                          *

vs.                                    *      Case No.: 21-CR-28-APM

THOMAS EDWARD CALDWELL                 *

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

### Motion and Memorandum in Support of Reconsideration of Detention

COMES NOW, the Defendant, Thomas E. Caldwell, by and through newly

retained counsel, and moves this Honorable Court, pursuant to reconsider its

February 12, 2021 decision ordering the detention of the Defendant pending his

trial, and files the below Memorandum in support of said motion.

### Background

On January 19, 2021, Caldwell appeared before U.S. Magistrate Joel C.

Hoppe subsequent to his arrest on a criminal complaint related to the instant

indictment. ECF No. 1-2, JCH-5:21-mj (W.D. Va.).  A virtual detention hearing was

conducted after which Caldwell was ordered detained.  On January 27, 2021, the

Government indicted Caldwell along with two other co-defendants, Jordan Crowl

and Jessica Watkins.  On February 8, 2021, Caldwell's prior defense counsel filed a

Motion for Release with the Court. ECF No. 10.  On February 12, 2021, the Court

conducted a virtual hearing on Caldwell's request to be released, at the

conclusion of which the Court ruled that Caldwell be detained.[1]  The Defendant is

currently being detained at the Central Virginia Regional Jail.

## **Legal Standard**

While the Rules of Criminal Procedure do not explicitly provide for motions

to reconsider, the courts in this district have repeatedly held that such motions

are proper in criminal cases.  See U.S. v Sunia, 643 F. Supp 2d 51, 60 (D.D.C.

2009), U.S. v Slough, No. CR 08-360 (RCL), 2014 WL 3734139, *2 (D.D.C. July 29,

2014), U.S. v Cabrera, 699 F. Supp. 35, 40 (D.D.C. 2010).  In deciding motions for

reconsideration in criminal cases, the courts apply the same standard applicable

in civil cases under F. R. Civ. P. 59(e).  See Sunia, 643 F. Supp 2d. at 60;  Slough,

2014 WL 3734139 at *2.  With respect to interlocutory orders, such as the order

granting this Rule 15 deposition, reconsideration should be granted "as justice

requires." Id.

---

[1] The Court first analyzed whether the Government had the authority to request a
detention hearing pursuant to 18 U.S.C. 3142(f), which spells out scenarios where
"detention is not an option."  The Court ruled that the Government had met its
burden to earn a detention hearing, as prosecutors convinced the Court that
Caldwell was a serious risk to obstruct or attempt to obstruct justice.  The Court
then concluded that Caldwell's release was inappropriate based on Caldwell's
alleged obstructive behavior and concerns for the safety of the community.

As the Court articulated in <u>Slough</u>, "asking 'what justice requires' amounts to determining, within the Court's discretion, whether reconsideration is necessary under the relevant circumstances." <u>Id</u>.  To "determine whether 'justice requires' reconsideration of a previously issued interlocutory order, the Court considers whether it 'patently misunderstood a party, has made a decision outside the adversarial issues presented to the Court by the parties, has made an error not of reasoning but of apprehension, or where a controlling or significant change in the law or facts [has occurred] since the submission of the issue to the Court.'" <u>Id</u>. (<u>citing</u> <u>Singh v. George Washington Univ</u>., 383 F. Supp. 2d 99, 101 (D.D.C. 2005)).  Moreover, "[e]ven if the appropriate legal standard does not indicate that reconsideration is warranted, the Court may nevertheless elect to grant a motion for reconsideration if there are other good reasons for doing so." <u>Sunia</u> at 61 (<u>citing</u> <u>Isse v American Univ</u>., 544 F. Supp. 2d 25, 29 (D.D.C. 2008)).  Here, justice clearly requires reconsideration.

### Reconsideration of Caldwell's Detention is Appropriate

Respectfully, a reconsideration of Caldwell's detention status is appropriate for several reasons.  First, as documented below, the Government has presented inaccurate statements to the Court regarding Caldwell and his alleged criminal conduct, which prevented the Court from making a fully informed decision before

3

ordering detention.  Second, Caldwell's prior counsel, although having been fully

advised by Caldwell as to defenses and responses to the Government's assertions,

failed to make any attempt to rebut several of the Government's inaccurate

claims.[2]  Third, Caldwell, a decorated, retired Lieutenant Commander (USN) who

still has shrapnel in his body from a service-related explosion, is in declining

health, is now using a wheelchair to ambulate, and is in excruciating pain in his

lower back and limbs.  Fourth, exculpatory evidence was revealed through

discovery that illustrates that the Government's case is not as strong as the Court

believed.  Fifth, Caldwell, who appeared virtually and apart from his attorney, was

unable to assist in his defense, especially by providing his attorney real-time

information that would have rebutted the Government's inaccurate statements.

Respectfully, if this decorated, disabled veteran is to be detained, the Court

should do so after being fully informed, and after Caldwell has been able to

present much more substantial arguments through new counsel.

_____

[2] Undersigned counsel has reviewed the transcript and court filings outlining
arguments made on behalf of Caldwell.  Prior counsel did not attempt to rebut a
single claim made by the Government that accused Caldwell of obstruction of
justice.  Additionally, prior counsel made little effort to provide the Court detailed
responses to other serious Government allegations that the Court ultimately
relied upon in ordering detention.  Because of COVID-19 protocols, Caldwell was
unable to sit next to his counsel to urge him to respond to inaccurate allegations
that the Court relied upon.

**Argument**

The Court's finding that the Government's case is strong against Caldwell was based upon incomplete and inaccurate information.  As the Court is keenly aware, Caldwell is charged with five counts in the Superseding Indictment.  Upon a review of the indictment and discovery, and based upon undersigned counsel's interview with Caldwell, the Government's evidence appears to be minimal with respect to Counts 1,2,3 and 5, and questionable as to Count 4 (trespassing).  The ultimate issue at the heart of the instant case against Caldwell is simple:  Was the January 6th, 2021 breach of the Capitol a pre-planned, premediated scheme designed to impede electoral certification process and, if so, was Caldwell involved in the conspiracy?  Or, conversely, was the Capitol breach, as Caldwell and other defendants have claimed, an unplanned, spontaneous event fueled by a variety of factors on the ground?  The evidence is strong that Caldwell is innocent.

**The Government's Case Against Caldwell is Weak**

All Americans agree that there is no crime in engaging in political protests and heated rhetoric.  Activists descending on Washington, D.C to have their (often disgruntled) voices heard is an American tradition.  Citizens have every right to

demonstrate, whether their beliefs are correct, incorrect, mainstream, or off-beat.  On January 6th, at the urging of former President Donald J. Trump, hundreds of thousands of disgruntled, patriotic Americans came to Washington to protest what they viewed as an unfair election.  Caldwell joined this protest to exercise his First Amendment right, a right he defended for 20 years in military service.

**Caldwell absolutely denies that he ever planned with members of the Oath Keepers, or any other person or group, to storm the Capitol**.  **Caldwell absolutely denies that he obstructed justice**.[3]  The word of a 20-year military veteran with no prior criminal record <u>is</u> evidence, and it is strong evidence, of his innocence.

Balanced against Caldwell's word is the Government's case.  If grandiose rhetoric was evidence, the Government's case would be very strong.  Respectfully, however, the Court should consider the evidence that the Government has <u>not</u> proffered to date:

1) Despite more than 200 arrests, the Government has not secured one confession from any defendant admitting that the breach of the Capitol

---

[3] The issue as to whether Caldwell violated 18 U.S.C. § 1752(a)(1) (Entering and Remaining in a Restricted Building or Grounds) is still being researched by undersigned counsel.  Obviously, however, this charge is the least of the Court's concerns in weighing the factors under the Bail Reform Act.

was premeditated.  In fact, the defendants in the instant case have

denied that there was a premeditated plan to attack the Capitol.

2) Despite interviewing hundreds of non-defendant witnesses, the

Government has not proffered a statement from any witness claiming

knowledge of a premeditated attack.  Notably, law enforcement

agencies have also denied having prior knowledge that an attack was

planned on the Capitol.

3) After reviewing tens of thousands of texts, tweets, Facebook messages,

emails, etc., the Government hasn't proffered to the Court one

communication that lays out, in detail, the <u>specific</u> alleged "plan" to

"invade" the Capitol.

4) Despite the alleged conspiracy involving months-long planning and

preparation by multiple ex-military members, i.e., individuals who take

pride in detailed planning and execution, the Government has not set

forth the logistics of the alleged plan to invade the Capitol.

In short, despite having an army of federal agents working around the clock

intensively investigating for almost three months, the Government has not

provided the Court with a confession, witness statement, or physical evidence

backing up their claim that any person or group had a <u>premeditated</u> plan to storm

the Capitol.  Caldwell asks rhetorically:  Doesn't the Court find it odd that the Government hasn't outlined the specifics of the premeditated plan?  What time was the "invasion" scheduled to begin?  Who would lead the attack?  What was the goal once the planners entered the Capitol?  Who was the leader in the attack?  What was the exit strategy of the planners?  The Government's indictment and arguments are heavy on dramatic language, but light on specifics. Instead, the Government's "evidence" consists almost entirely of their dubious interpretations of social media posts, text messages, and the like.

**Interpreting Social Media Communications is not the Government's Strong Suit**

As the Government's evidence at this point relies almost entirely on its interpretation of the private communications of others, the Court should examine the Government's track record.  Consider the events that led up to Caldwell being charged.  On January 17, 2021, FBI Agent Michael Pallian, Jr. swore out an affidavit in support of charging Caldwell.  This affidavit was taken out the same day that agents raided the Ohio homes of co-defendants Watkins and Crowl. Before January 17th, there is no indication that Caldwell was on the radar of the FBI.  Nevertheless, on that date the Government alleged that Caldwell was not only a "fellow Oath Keeper" of the co-defendants, but also had a "leadership

role"—"the Commander"-- in the organization.  See ECF No. 1-2, JCH-5:21-mj

(W.D. Va.).  The Government also claimed that Caldwell stormed the "inside" of

the Capitol with his co-defendants.  Id.

Quietly, however, the Government has now tacitly confessed "oops" to its

prior inaccurate claims that Caldwell was 1) a Commander in the Oath Keepers, 2)

a member of the Oath Keepers, and 3) that he stormed the inside of the Capitol.[4]

Tellingly, these three inaccurate claims were made almost entirely through

"interpretation" of social media communications among the co-defendants.  For

example, the FBI was quite surprised to learn that the "Commander Tom" handle

in social media posts, which it quickly relied on to assert that Caldwell was an

Oath Keeper "Commander," actually is a reference to Caldwell's rank in the U.S.

Navy—Lt. Commander Thomas Caldwell.  The Government also misinterpreted

Caldwell's social media posts in reaching their inaccurate conclusion that Caldwell

entered the Capitol on January 6th.

In less than a month, the Government's theory as to Caldwell's role in the

claimed conspiracy has morphed from him being the Commander of Oath Keepers

---

[4] Not so quietly, multiple news organizations have repeated these inaccurate statements across the world.  Accordingly, Caldwell and his wife have received threatening correspondence at their home and the jail.

who (presumably) led the attack on the east side of the Capitol, to a guy "associated" with the Oath Keepers who "was positioned on the west side of the Capitol[] . . . storm[ed] past barricades . . . up to a balcony [outside] the west side of the Capitol building."  (Indictment at ¶75).  Additionally, Caldwell has morphed from a "fugitive" from justice with active "warrants" to having no prior record.  That is, at his initial detention hearing before a magistrate judge, Government counsel inaccurately asserted that Caldwell was a "fugitive" from justice with outstanding warrants.[5] <u>ECF</u> No. 10-1, JCH-5-21-mj (W.D. Va.), Tr. pg. 20.  Shockingly, within 48 hours, <u>the Government made four substantial, inaccurate representations</u> to the federal judiciary regarding Caldwell, three of which were based entirely on misinterpreting social media posts.  Caldwell's stellar background and military career was, unintentionally, slandered by the Government's sloppy, rushed investigation.

    That the Government made four significant, inaccurate allegations against Caldwell is not surprising, as authorities have rushed this investigation.  As the

---

[5] One reason why it is in the "interests of justice" for the Court to reconsider and release Caldwell on conditions is that his initial detention hearing was essentially stacked against him.  The Government made three substantial inaccurate claims about Caldwell, and Government counsel inaccurately advised the Court that Caldwell was a fugitive.  Again, Caldwell appeared virtually, and had very little chance to communicate with counsel.

Court knows, the Government typically takes months and even years to build

cases, painstakingly gathering and evaluating evidence and interviewing

witnesses.  By contrast, in this case the Government charged a 20-year decorated

Navy veteran with no prior record based on a few hours of investigation and

without giving him the courtesy of an interview.[6]  Accordingly, unlike most cases,

the Government's characterization of the strength of the evidence against

Caldwell should be given very little weight, as authorities did virtually no

investigation before branding Caldwell a felon, and have provided multiple

inaccurate statements to the Court.[7]

## Major Errors and Omissions by the Government

The Government has presented the Court with an inaccurate picture of the

evidence against Caldwell and others.  One substantial inaccuracy involves Oath

---

[6] Investigators searched the Ohio homes of Watkins and Crowl on the morning of January 17th.  The criminal complaint against Caldwell was sworn out at 3:45 p.m. on that same day.  See ECF 1-2, JCH-5:21-mj (W.D.Va.) (criminal complaint and affidavit).  In other words, the FBI spent a couple of hours "investigating" Caldwell before charging him with serious federal crimes, obtaining a search warrant, and entering his homes with guns drawn.

[7] While Government counsel and agents are undoubtedly honorable professionals, it is human nature to "dig your heels in" once a major charging decision is made, even if the evidence suggests that the decision to charge was incorrect.  The Court should consider this factor when evaluating the Government's belief as to the strength of its case.

Keeper communications via a walkie-talkie type app called Zello.[8]  The Court

placed great weight on this evidence, as it purported to show a specific,

contemporaneous plan to breach the Capitol.  In court papers, the Government

described the Zello communications as follows:

> "At the approximate 5 minute mark, the voice believed to be [co-defendant] Watkins reports, "We have a good group.  We have about 30-40 of us. *We are sticking together and sticking to the plan*."

> "At the approximate 7 minute 44 mark, an unknown male states, "You are executing citizen's arrest.  Arrest this assembly, we have probable cause for acts of treason, election fraud."  The voice believed to be WATKINS responds, "We are in the mezzanine.  We are in the main dome right now.  We are rocking it . . .[.]"

ECF 1-1, ¶27 (ZMF-21-119) (second criminal complaint) (emphasis added).[9]  The

latest indictment includes the same chronological representation, only

without time-stamps.

The Government's inference is clear:  The Oath Keepers had a plan to

invade the Captiol and arrest elected officials, discussed this "invasion plan" at

the "5 minute mark," and were inside the Capitol a few minutes later executing

the plan (at the 7:44 mark).  Unfortunately, the Court has been misinformed by

---

[8] Caldwell did not use Zello.  Apparently the Oath Keepers utilized Zello to communicate together.

[9] The Government also included this characterization of Zello communications in an affidavit to search Caldwell's home and in a memorandum seeking detention for Ms. Watkins.  ECF No. 3-1, ¶34 (W.D. Va.); ECF No. 15, p. 2.

the Government.  Upon receipt of discovery, undersigned counsel discovered that

the Government's Zello evidence actually consists of <u>a National Public Radio (NPR)</u>

<u>report</u>, which aired random snippets of Zello communications.  The above time-

stamps the Government referenced are time-stamps <u>in the NPR report</u>, not from

Zello.  In other words, the referenced Zello communications did not take place 2

minutes and 44 seconds apart in real time.  Accordingly, the Court and a

magistrate judge, who signed a search warrant based partly on this

representation, were under the misimpression that solid, contemporaneous

evidence existed of a premeditated plan to breach the Capitol.

Ironically, after listening to these Zello communications, the Government's

smoking-gun proof of premeditation fizzles.  Specifically, it is clear that the

communication regarding "sticking to the plan" happened several hours before

the Capitol breach, and probably in the very early morning, <u>as there is no crowd</u>

<u>noise in the background</u>.[10]  By contrast, the second Zello communication (from

inside the Capitol) had substantial background noise.  In short, the Court, which

took these communications heavily into account in detaining Caldwell (and

---

[10] Published reports suggest that as many as 500,000 demonstrators showed up
to the rally.  The fact that the audio reveals no crowd noise suggests that this
particular Zello communication happened before hundreds of thousands of rally-
goers entered the streets of Washington.

Watkins), was misinformed by the Government.  As Watkins' counsel (correctly) represented to the Court, the communication regarding the "plan" was referring to the plan to protect rally supporters from Antifa.  To Caldwell, this is the fifth substantial inaccurate claim the Government has used against him. More importantly, this inaccurate representation was unknown by Caldwell at the time of his first detention hearing.

At Caldwell's detention hearing, the Government did not bring to the Court's attention two exculpatory text messages in discovery, messages that, if believed by a jury, would completely exonerate Caldwell of engaging in a conspiracy or other premeditated action.  In a contemporaneous text (7:34 p.m.) on January 6th, responding to a text inquiring if he was at the rally, Caldwell texted:

> Hell yeah!  [My wife] and I rolled with the Oathkeepers and some other militia.  Heard the President then marched to Capitol Hill.  Started addressing the like[-]minded folks around us.  Cops out of nowhere started throwing flash bang grenades and then teargassed a kid's group.  No shit.  Then we heard that Pence fucked us.  W[e] had over a million [pe]ople here.  *Then the lying media said Trump supporters were breaking through barricades so [I] said if we're going to get blamed, might as well do it so I grabbed up my American flag and said let's take the damn capitol . . .[.]*

(emphasis added).  In another text to a friend that evening, Caldwell asked:

> Did you see us storm the Capitol today?  [My wife] is exhausted and will give you the long version later but suffice to say I am a rabble

> rouser of the first order *and when provoked and attacked by the cops for no reason* as we were [p]eacefully assembled *it was instinct* to snatch up my American flag and race for [t]he [C]apitol steps[.]

(emphasis added).[11]  These texts 100% back up Caldwell's claim (and that of other defendants) that the surge on the Capitol was <u>spontaneous</u> and not the result of a premeditated plan.  Caldwell, for instance, complains about the "lying media" blaming Trump supporters for "breaking through barricades," indicating his lack of knowledge of an attack plan.  Moreover, these texts confirm that (understandable) actions taken by police (tear gas, etc.) provoked the crowd, and that Caldwell's "instinct" caused him to approach the Capitol.[12]  These contemporaneous texts drive a stake through the heart of the Government's claim that Caldwell was engaged in a premeditated attack on the Capitol.  The Court was not informed about this exculpatory evidence at the detention hearing, and Caldwell was unaware that they were preserved.

---

[11] In a January 13, 2021 at 11:37 a.m. message, Caldwell advised a contact that, "As I commented on one of your posts, I was there at the Capitol and it was a love-fest until the cops attacked women and children."  Yet more evidence that the Capitol breach was not pre-planned.

[12] Comically, in these texts Caldwell portrays himself like actor Mel Gibson in the movie *The Patriot*, picking up an American flag and leading the charge.  Unlike Mel Gibson, however, Caldwell has undergone multiple spinal fusions, is permanently disabled, and requires the occasional use of a cane to ambulate.

In a similar vein, the Government's rush to judgment has blinded it to overwhelming evidence that backs up Caldwell's claim that the "concerning" social media chatter at issue in this case referred to a desire by all defendants to protect rally supporters from Antifa. Terms like "hunting," "op," "planning," etc. refer generically to Caldwell and others protecting Trump supporters from Antifa. Again, the Government overlooked Caldwell's lengthy November 26, 2021 post, discussing Antifa vis-à-vis a just completed Trump rally:

> I was HONORED to be part of *our D.C. op* [on November 15th] which could have been so much more than it was in effectiveness. I fear for our country if President Trump is cheated out of office. I know that we can *bloody antifa on our next op* if that is our objective. If [Trump] is successful we will be forced into action to *counter them* [(Antifa)] . . .[.] I am thinking that we need to decide if the next [MAGA] march on [December] 12th *is the time to go hunting*. As always, we have to figure out what our true objective is and can we serve the overall cause of preserving our Republic through a presence or *through a violent confrontation with bad guys attempting to harm innocent civilians*. If we can answer THAT question, then we will know what to do; then it's *planning and attention to detail* comes next.

(emphasis added). In the above text, Caldwell is clearly expressing the group's concerns about Antifa. The "op," i.e. operation, was to stop Antifa from "harm[ing] innocent civilians." The term "hunting," likewise, refers to identifying violent Antifa members.[13] In short, the Government is misinterpreting social

---

[13] In a January 6, 2021 text at 3:08 a.m., co-defendant Crowl messaged a friend that after the rally that day, he intended on "head[ing] back out [that] night "tifa"

media communications, straining to make words and phrases fit its rushed

conclusion that the Capitol breach was premeditated.[14]  Additionally, at the time

of the first detention hearing, Caldwell was unaware that the Government was in

possession of numerous communications among the co-defendants that are

exculpatory, i.e., they prove that the concerning language used by Caldwell and

others antedated the January 6th Capitol breach, and that this "lingo" was used in

regards to concerns about Antifa.

## The Quick Reaction Force:  A Force that was Neither Quick, Reactive, nor a Force

In a similar fashion, the Government overstated concerns regarding

Caldwell's references to a "Quick Reaction Force."  The Court placed great weight

in making its detention decision on the threat this "Quick Reaction Force"

allegedly posed to the public.  Ironically, however, the "Quick Reaction Force" was

neither "quick," "reactive," nor a "force."  The "Quick Reaction Force" was one

_____

hunt'in.  We expect good hunting."  Again, every reference to "hunting" used by
the defendants is in the context of protecting Trump rally supporters from violent
Antifa members.

[14] In this text, Caldwell portrays himself as a military planner ala General Patton.
To outsiders who don't know him, i.e., Government prosecutors and agents,
Caldwell's colorful language suggests that he was itching to go out and scuffle
with 20-something Antifa activists on the street.  In reality, Caldwell's physical
condition is poor.  His days of fighting ended decades ago subsequent to his
service-related injuries.

person.  Multiple sources have advised undersigned counsel that PERSON

THREE—*the* Quick Reaction Force-- is in his late 60s, obese, and has cardio-

pulmonary issues, a bad back, a bum knee, and is need of a hip replacement.  The

Government's fanciful suggestion that right-wing tactical commandos were

waiting in the wings to storm the Capitol is one for the ages.  Likewise, multiple

sources have confirmed to undersigned counsel that PERSON THREE's assignment

as "Quick Reaction Force" was designed to "humor the old man."

 Actually, if the Court looks past the Government's puffery and instead

unpacks prosecution filings, Caldwell's understanding of the "Quick Reaction

Force" is confirmed.  For example, according to the superseding indictment,

Caldwell texted that PERSON THREE is "too broken down to be on the ground all

day," an obvious reference to PERSON THREE's health issues.  (Indictment at ¶43).

Further, Caldwell texted that PERSON THREE "is committed to being *the* quick

reaction force[,]" confirming that this latent commando force consisted of one

person.  Id.  (emphasis added).  According to multiple sources, PERSON THREE

likely didn't leave his Virginia hotel that day, essentially depriving the Oath

Keepers of his "ground support."[15]  In short, the Court was not fully informed of

the innocuousness of the "Quick Reaction Force" at the detention hearing.[16]

      So what explains Caldwell's colorful language, bravado, and jingoistic

vocabulary?  According to his wife, Caldwell talks in military "lingo" all of the time,

which is not uncommon for career sailors.  Hence, a convenient hotel is located

within "striking distance" of DC.  A veteran is not "Ms. Watkins" but rather

"Captain."  Taking a quick drive through Washington to make sure that Antifa is

not organizing to hurt Trump supporters was "doing reconnaissance" or "going

hunting."  To put his personality in more context, Caldwell is an amateur screen

writer.  Specifically, Caldwell has written screenplays with military style plots.[17]

---

[15] Apparently, the only "shots" taken by PERSON THREE on January 6th were from glasses.

[16] The whole discussion about a "Quick Reaction Force" boils down to a bunch of ex-military guys trying to out-plan one another.  The proposal was to have PERSON THREE in Virginia, available on quick notice in the event that Antifa or other left-of-center protestors attacked the Trump rally-goers with weapons. PERSON THREE was to "extract" Oath Keepers out of the District.  Caldwell and others were maniacal about following the Rule of Law, i.e., not bringing weapons into the District.  Multiple defendants sent messages advising rally-goers to not bring guns or weapons to the District as it was against local laws.  The very notion that the defendants were strictly adhering to the law, while simultaneously planning an illegal breach of the Capitol, is beyond the pale.

[17] Caldwell advises that the IRS has tax records confirming that he once listed writing screenplays as his avocation.  Additionally, the screenplays in undersigned counsel's possession are dusty and were written with a typewriter.

Undersigned counsel has read a couple of these screenplays, which are heavy on

hyperbolic military language.  To give the Court a sample of his writings, in one

screenplay Caldwell depicts a "dog fight" between rival aircraft, with one pilot

radioing out "Buzzard One, this is Slingshot, I got two bogies on my six; say again,

two bogies on my six; May-day, May-day."  What the Government

misunderstands is that Caldwell's language and personality center around his

military career and his addiction to Hollywood.[18]  In short, the Government has

misinterpreted Caldwell's online persona and, accordingly, has charged an

innocent person.

### Caldwell did not Obstruct Justice—Rather, he Fully Cooperated with Law Enforcement

The Government's claim that Caldwell engaged in numerous acts of

obstructive behavior is not supported by the facts.  A review of the detention

hearing transcript reveals that Caldwell's prior counsel did not lift a finger to rebut

inaccurate allegations that Caldwell obstructed justice.  Unbelievably, the Court

was never informed that Caldwell, subsequent to his arrest, gave a lengthy, no-

holds bar interview with multiple FBI agents at his home.  Caldwell waived his

---

[18] Some of the lines that the Government cites in its papers are straight from
Hollywood.  The best example is "storming the castle" and "I'm such an
instigator."  These are classic lines from the 1980s classic movie *The Princess
Bride*.

*Miranda* rights and agreed to speak without a lawyer present.  Caldwell answered

dozens of questions posed to him by agents.  Caldwell freely admitted that he was

at the Capitol rally on January 6th, which belies the Government's claim that he

was destroying evidence to hide his attendance.  When confronted by skeptical

FBI agents about his claim that he never entered the Capitol, Caldwell walked the

agents through his movements and debunked the Government's claim that he

stormed the inside of the Capitol.  Confronted by skeptical agents that he was a

member of the Oath Keepers, Caldwell refuted the Government's claim point-by-

point, social media message-by-message.  Comically, when confronted by agents

with their inaccurate belief that he was the "Commander" of the Oath Keepers,

Caldwell informed agents that he was a Commander—a retired Lt. Commander in

the U.S. Navy.  Notably, Caldwell advised agents that he sometimes requires a

cane to ambulate and takes multiple prescription pain killers to relieve back pain,

which belies Government claims that he would be a danger if released.

During his interview, moreover, Caldwell fully briefed agents as to his

questioned contacts, providing names, dates, and places.  Importantly, <u>he</u>

<u>provided unscripted answers to the FBI about social media messages that the</u>

<u>Court raised concerns about at his detention hearing.</u>  He explained that the term

"going hunting" was a reference to a phrase used by the founder of New York's

Guardian Angels,[19] Curtis Sliwa, who famously used the phrase in the sense of "going hunting for criminals."[20]  He explained his contacts with the Oath Keepers, who he viewed as a self-styled group of patriots who sought to protect Trump supporters from Antifa and who provided security at Trump events.  The concerning social media posts Caldwell made, he explained, all referred to fear that Antifa would attack Trump supporters on January 6th.[21]  Contrary to Government filings and arguments to the Court, which are riddled with inaccuracies, Caldwell's explanations completely checked out.

As a result of Caldwell's truthful FBI interview, the Government subsequently backed off its inaccurate allegations that Caldwell was an Oath

---

[19] The Guardian Angels is a well-respected, citizen-based law enforcement group founded in the early '80s to combat out-of-control crime in New York City.

[20] See Maura Ewing, The Atlantic, December 1, 2017, The Volunteer Vigilantes of New York, (interview with Guardian Angels founder Curtis Sliwa) ("The predators underground in the subways are creatures of habit. We get their photographs, and we begin to hunt them.").  Caldwell's unscripted answer checks out completely.

[21] This fear was well-founded.  In fact, contrary to the Government's suggestion that Antifa is a virtuous group with a few bad apples, this organization is a domestic terrorist organization that has taken over cities like Portland and Seattle, burned buildings and churches, killed and injured police officers, defaced and destroyed public monuments, and violently injured hundreds of Trump supporters across the country.  In fact, just a month before the Capitol was breached, Antifa attacked elderly Trump supporters at a December rally in Washington.

Keeper member, that he held a leadership role in that organization, and that he

stormed the inside of the Capitol on January 6th.  Notably, the Government has

not disputed one word of Caldwell's lengthy, recorded interview.  *A fortiori*, if the

Government believed Caldwell's interview enough to back off major allegations in

court filings, the Government tacitly concedes that Caldwell's entire interview,

including the part where he denies a premeditated plan to invade the Capitol, is

credible.

Respectfully, the Court's finding that Caldwell presents a serious risk to

obstruct justice was made without full and complete information and context

through no fault of Caldwell.  A defendant who fully cooperates with law

enforcement, waives his rights, and gives a lengthy interview with agents is not a

risk to obstruct justice.  Additionally, Caldwell signed consent forms for the FBI to

search the out-buildings on his property and voluntarily provided agents <u>with the</u>

<u>password to his computer</u>.

Likewise, the Court was also not fully informed about the circumstances

surrounding the co-defendants' flight to Caldwell's farm in Virginia, which partly

factored into the Court's decision for detention.  Contrary to the Court's

understanding, Caldwell informed FBI agents that Watkins and Crowl contacted

him—not vice-versa--and requested to come to his farm to <u>get away from the media</u>, not law enforcement.[22]  That is, subsequent to a *New Yorker* article that identified Watkins and Crowl as being involved in entering the Capitol, their small town Ohio residences were surrounded by scores of media.[23]  Caldwell informed agents that when Watkins received word that she was wanted by authorities, <u>Caldwell encouraged the pair to turn themselves in immediately</u>, which they did.[24]  Caldwell's wife confirmed this fact with undersigned counsel.  Ironically, instead of obstructing justice, Caldwell actually assisted the administration of justice.  Yet

---

[22] Undersigned counsel reviewed over a thousand social media messages in discovery.  Multiple messages from Watkins and Crowl express a desire to run away from the media throng that descended on their small Ohio hometown.  Not one message evinces an intent to avoid authorities, who had not yet charged the two with a crime.  In fact, Watkins' mother, who is not a suspect in this case, fled Ohio and hid from the media in Florida.  Also, discovery confirms that Watkins and Crowl reached out to Caldwell, not vice-versa.

[23] Similarly, the Government's claim that Caldwell advised Watkins and Crowl to "avoid law enforcement" by making sure that they were not followed to his farm is misplaced.  Caldwell's concern was that the pair weren't followed by <u>the media</u> to his farm.  Caldwell did not want a hundred reporters camped outside his farm.

[24] A text sent from Caldwell's phone on January 17, 2021, the date of the FBI's search of Watkins home took place, indicates a desire to contact a lawyer for Watkins and Crowl.  Again, Caldwell <u>assisted</u> authorities by encouraging the pair to turn themselves in and seeking out legal counsel.

the Court was not presented with any of this information at Caldwell's detention hearing.

In detaining Caldwell, the Court placed great emphasis on Caldwell's alleged offer to Watkins and Crowl to "stash" evidence at his house.  Again, the Court was provided inaccurate information by the Government.  Caldwell texted Crowl on January 17th as follows:  "Bring full battle rattle to stash here if you want."  Unfortunately, the Government incorrectly advised the Court that "battle rattle" is "believed to be a reference to the camouflaged combat fatigues worn by members of 'the stack' . . . during the assault on the Capitol."  ECF no. 18, pg. 14, n.6. *Au contraire*, a 10-second Google search confirms what Caldwell advised undersigned counsel:  "battle rattle" refers to "every piece of military gear a soldier carries."[25]  Caldwell was absolutely not telling Crowl and Watkins to "hide their uniforms," a translation that conveniently fits the Government's template.

While prosecutors and defense lawyers are accustomed to suspects "stashing the drugs," the term "stash" is used in rural American to mean "store your stuff."  Rural Americans like Caldwell often use phrases like "stash your gear," or a "stash of hunting rifles," etc.  When asked about the word stash,

---

[25] See https://www.merriam-webster.com/dictionary/battle%20rattle.  Hence the "rattle" of canteens, backpack, helmet straps, etc.

Caldwell started singing to undersigned counsel the iconic 1968 country music song "Gentle on My Mind" by the late Glen Campbell, a song about a hobo who wanders the country, and pays homage to a friend who allows him to occasionally "stash his sleeping bag behind the couch."  In other words, Caldwell's invitation to "stash full battle rattle here" was clearly a country way of saying to a couple of vets:  "You are welcome to bring everything you need to stay as long you wish."[26]  Caldwell advised his prior counsel of this information, but it was not presented to the Court.

### The Government's Claim that Caldwell Destroyed Evidence is Inaccurate

The Government's claim that Caldwell destroyed evidence is wrong.  In Count 5 of the First Superseding Indictment, the Government asserts that Caldwell tampered with evidence in two ways:  First, "[o]n January 8, 2021, in response to a request from [co-defendant] Crowl for a video, CALDWELL sent the video, and subsequently unsent the message containing the video."  Second: "Between January 6, 2021, and January 19, 2021, CALDWELL deleted photographs

---

[26] The very notion that Caldwell would encourage Watkins and Crowl to hide their uniforms at his house is silly.  The pair had already admitted to the media that they were inside the Capitol and had posted their pictures all over their social media platforms.  Neither Watkins nor Crowl brought their uniforms to Caldwell's farm.

from his Facebook account that documented his participation in the attack on the Capitol on January 6, 2021."  (Indictment, ¶¶86-87).  Unfortunately, the Government's rushed investigation has resulted in yet another baseless allegation.

The video message sent by Caldwell and later "unsent" apparently was done via Facebook Messenger which, unlike texting, allows the sender to un-send messages, effectively deleting them from the Facebook Messenger accounts of the recipients.  The Government's suggestion that Caldwell had a devious motive to "un-send" the message is belied by the fact that Facebook Messenger's "un-send" feature is only available for 10 minutes.[27]  In other words, Caldwell, subsequent to sending the message, had 10 minutes or less to "recall" it.  Sending a message and then quickly un-sending a message is a rather unique way to "obstruct justice."  And, contrary to the Government's suggestion, the video that was sent to Crowl, like every single video and photo Caldwell took at the January 6th rally, was still on his phone when it was seized by the Government.  In other words, the "unsent" video referenced by the Government was never destroyed.

---

[27] See https://turbofuture.com/internet/How-to-Unsend-Messages-in-Facebook-Messenger ("Facebook Messenger allow users only 10 minutes to un-send their messages.").  The "un-send" feature on Facebook Messenger is an "oops" feature designed to allow the sender to recall messages that were sent in error.

Caldwell did not destroy a single photo or video.  The Government has every single photo and video that Caldwell took on January 6th.  Caldwell's prior counsel did not rebut these misplaced allegations.

The Government next claims that Caldwell manifested obstructive behavior when, in response to a question from a Facebook contact as to whether he was on Facebook, Caldwell responded:  "Yes I am.  I am in the process of pulling off all my pix etc."  The Government's speculation as to Caldwell's motives is inaccurate. This message took place on January 9, 2021, just two days after Facebook announced that it was suspending President Trump from its platform, which prompted a backlash against the company by Trump supporters.[28]  Caldwell indicates that he removed pictures from his (private) Facebook account for two reasons:  First, he wanted to save the pictures to his computer in the event that Facebook locked his account, which the company was routinely doing to out-spoken Trump supporters; second, and related, he had decided to leave Facebook in protest and was gradually planning on shutting down his account.  Importantly, the Government is wrong about the nature of the pictures, i.e., none of the

_____

[28] https://about.fb.com/news/2021/01/responding-to-the-violence-in-washington-dc/.

pictures Caldwell removed from Facebook <u>were taken at the January 6th rally</u>.[29] Ironically, when the FBI searched his house, Caldwell, upon request, <u>provided the password</u> to this computer so that agents could easily retrieve January 6th photos and videos.  He also freely admitted that he was on the Capitol steps on January 6th.  Caldwell did not "destroy" evidence.  Again, Caldwell's prior counsel rebutted none of these inaccurate allegations.

The Government's claim that Caldwell engaged in behavior that makes him a risk to obstruct justice if he is released from jail is without merit.  Caldwell took and gave orders for 20 years in the Navy.  He cooperated with law enforcement when he had the right not to.  He signed consent forms to search his property and provided a password to aid the search of his computer.  Every photo and video he took on January 6th was stored on his phone or computer or both.  Caldwell fully cooperated with law enforcement, despite the manifest unfairness of being charged on the flimsiest of evidence.  He poses zero threat to public safety or the administration of justice if he is released.[30]

---

[29] Despite the fact that Facebook, Inc. stores everything, the Government neglected to specifically identify the allegedly "incriminating" photos that Caldwell took down from Facebook.

[30] Notably, FBI agents, upon searching his computer, accused Caldwell of using "encrypted email."  In fact, Caldwell explained that Watkins, who did not have her

Caldwell is currently suffering in jail.  On undersigned counsel's last visit, Caldwell was ambulating in a wheelchair.  The facility he is housed at does not have a doctor on staff.  Caldwell requires a higher standard of medical care than a small-town jail can provide.  He poses no danger to the public, as the Court now understands that his social media "bark" doesn't match the "bite."  He will gladly agree to keep weapons and communication devices out of his home if released. In short, if anyone deserves the presumption of innocence, it is a decorated Navy veteran who appears to be a victim of a rush to judgment by the Government.

## Conclusion

The Court has been presented with multiple reasons that provide grounds for reconsideration and release.  Exculpatory text messages show, almost contemporaneously, that Caldwell was not conspiring with anyone to breach the Capitol.  Exculpatory text messages show that Caldwell (and others) were using words and phrases like "hunting," "reconnaissance," "operation," "quick reaction force," etc. in the context of protecting rally-goers from Antifa activists. Caldwell's prior counsel failed to debunk the Government's inaccurate claims of obstruction of justice, despite being briefed on Caldwell's "side of the story."

---

phone with her while a guest at his farm, used Caldwell's computer to send emails on "Proton," an encrypted email service.

What appeared to be a strong case for the Government on February 12th no longer looks so strong now that minimal discovery has been reviewed.  Finally, while undoubtedly unintentional and the product of haste, the Government nonetheless has offered numerous inaccurate claims to the judiciary, including several based on their misinterpretations of social media communications.

Caldwell respectfully requests that the Court consider releasing him on whatever conditions the Court believes is appropriate.


_____/s/_____
David W. Fischer, Esq.
Federal Bar No. 023787
Law Offices of Fischer & Putzi, P.A.
Empire Towers, Suite 300
7310 Ritchie Highway
Glen Burnie, MD 21061
(410) 787-0826
fischerandputzi@hotmail.com
Attorney for Defendant

**CERTIFICATE OF SERVICE**

    I HEREBY CERTIFY that on this 2nd day of March, 2021, a copy of the foregoing Memorandum in Support of Motion to Reconsider Detention Status was electronically filed with the Clerk of the United States District Court using CM/ECF, with a notice of said filing to the following:


Counsel for the Government:    Office of the United States Attorney
    555 4th Street, NW
    Washington, DC 20001


          /s/
          David W. Fischer, Esq.